IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SOUTHWEST RISK, L.P. | § | |
| CLEARVIEW RISK HOLDINGS, LLC | § | |
| | § | |
| VS. | § | C.A. NO. _____ |
| | § | |
| IRONSHORE SPECIALTY INSURANCE | § | |
| COMPANY | § | JURY TRIAL REQUESTED |

## PLAINTIFF'S ORIGINAL COMPLAINT FOR DECLARATORY JUDGMENT

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Southwest Risk, L.P. ("Southwest Risk") and ClearView Risk Holdings, LLC ("ClearView"), plaintiffs, file this lawsuit in order to obtain insurance coverage under the Professional Liability Policy issued to them by defendant, Ironshore Specialty Insurance Company ("Ironshore) for liability arising from an error or omission in the placement of insurance by Southwest Risk, L.P., prior to its acquisition by ClearView.

### PARTIES AND SERVICE OF SUMMONS

1. Plaintiff, Southwest Risk, L.P., is a Texas limited partnership with its principal place of business in Texas.

2. ClearView Risk Holdings, LLC is a Delaware-chartered limited partnership with its principal place of business in Texas. Its members are citizens of Texas, New York and Illinois.

3. Defendant, Ironshore Specialty Insurance Company ("Ironshore"), is an Arizona corporation with its principal place of business in Massachusetts. It is a surplus lines insurance company not admitted as an insurer in the state of Texas. It therefore may be served with summons through the Texas Commissioner of Insurance at the Texas Department of Insurance, P.O. Box

149104, Austin, Texas 78714 or alternatively through service directed to its president at its home office: 75 Federal St.; 5th Floor; Boston, Mass. 02110.

### JURISDICTION AND VENUE

4.   The court has jurisdiction over this lawsuit pursuant to 28 U.S.C. §1332, based on diversity of citizenship, because plaintiffs and defendant are citizens of different states. More than $75,000 is in controversy, as the dispute involves coverage for liability arising from failure to timely place a layer of excess coverage for customers of Southwest Risk (later purchased by, and its liabilities paid, by ClearView). Southwest Risk's already-paid liability for failure to place that layer of coverage exceeds Ironshore's $5 million limit of professional liability coverage, and that amount is expected to increase as pending claims are resolved.

5.   Venue is proper in this district and division, within 28 U.S.C. §1391(b)(2), because the acts giving rise to the liability for which plaintiffs seek insurance coverage occurred here, Southwest Risk's liability was determined in lawsuits filed here, and Ironshore's insurance obligations were performable here. Alternatively, venue is proper pursuant to 28 U.S.C. §1391(b)(3) because Ironshore is subject to personal jurisdiction in this court for the claims at issue in this lawsuit.

### PLAINTIFFS' TORT LIABILITY THAT TRIGGERS IRONSHORE'S COVERAGE

6.   ClearView acquired Southwest Risk at the end of December 2010. Before and after that acquisition, Southwest Risk has been engaged in the insurance brokerage business, specializing in property and casualty coverages, especially for the real estate and construction businesses. Southwest Risk was engaged, in early September 2008, in placing a tower (multiple layers) of property insurance coverage for a commercial client, American Real Estate Advisory Council ("AMREAC"), the owner of various apartment complexes in the Houston metropolitan area. This was a professional service within the scope of coverage under Ironshore's policy.

2

7.   Southwest Risk timely placed the first two layers of coverage, for a total of $35 million, but had not placed the third layer prior to the development of Hurricane Ike and insurers' perception that it threatened to make landfall from the Gulf of Mexico. As a result, when Southwest Risk placed the third layer of coverage, it was able to do so only with exclusions for damage that might be caused by Hurricane Ike, or with inception dates after Hurricane Ike made landfall. In either event, none of the three third-layer insurers' policies covered property losses caused by Hurricane Ike. The storm struck Galveston at approximately midnight on September 13, 2008, causing damage to properties for which Southwest Risk had undertaken to provide insurance coverage for its customers, the property owners in the AMREAC tower of coverage.

8.   Damage to the insured properties from Hurricane Ike resulted in multiple claims for property coverage. Seven different "Centaurus" entities, each owning one or more different apartment complexes in metropolitan Houston (and whose names included the names of the complexes they owned), filed claims and eventually individual lawsuits in state district courts of Harris County, Texas against one or more insurers providing coverage in the AMREAC tower of coverage (which applied to the properties owned by the Centaurus entities, and included a third layer inapplicable to Ike claims). Those entities sued Lexington Insurance Company (providing the initial $25 million layer of coverage) and Alterra Excess & Surplus Lines Insurance Company f/k/a Max Speciality Insurance Company (providing the second, $10 million dollar layer of coverage). The third layer of the AMREAC tower was $15 million, shared by Axis Excess & Surplus Insurance Company ($10.5 millions), Essex Insurance Company ($2.5 million) and Ironshore ($2 million).

9.   Initially it appeared such claims would be paid within the limits of the first ($25 million) layer of insurance coverage provided by Lexington Insurance Company. Eventually—by November, 2011—it became apparent the claims exceeded that first layer of coverage, and reached into the

3

second ($10 million) layer of coverage provided by Max Specialty Insurance Company (later, Alterra). After Lexington tendered or exhausted by payment its $25 million limit of coverage, the focus of the Centaurus plaintiffs shifted to the second layer of the tower coverage. Alterra, as the second layer insurer, invoked the appraisal clause in its policy in November 2011, shortly after Lexington exhausted its $25 million primarily limit.

10.   The seven Centaurus entities each joined Southwest Risk as a defendant in their responsive lawsuits in May, 2012, alleging professional negligence in failing to timely place the third layer of coverage for the AMREAC tower (so as to include claims arising from Hurricane Ike), and failing to timely report that failure to the insureds for whom it was placing coverage. Plaintiffs also sued for violations of the Texas Deceptive Trade Practices Act ("DTPA") and/or Texas Insurance Code. Those claims (lawsuits) against Southwest Risk were all asserted during the second policy period, and Southwest Risk gave notice to Ironshore of those claims during the second policy.

11.   A few months after Southwest Risk was added as a defendant to the seven Centaurus lawsuits in or near May 2012, the Centaurus entities sought and obtained a tolling agreement from Southwest Risk that allowed them to dismiss it without a limitations risk in those lawsuits, so that they could better pursue recovery from Alterra, the second layer carrier in the AMREAC tower, which had invoked the appraisal clause in its policy. Alterra was contesting that the claims reached to any point close to its $10 million limit of coverage, and it had set reserves for outstanding claims at a fraction of that limit. Southwest Risk was not contemporaneously provided with Alterra's paperwork and claim evaluations, but sought to determine the value being placed by the second level insurer on outstanding claims. It appeared, from what Southwest Risk was able to determine in 2012, that outstanding claims for property coverage arising from Hurricane Ike would fall well inside Alterra's $10 million limit.

4

12.   Alterra, however, hired Chicago counsel to represent it in the Harris County, Texas lawsuits, and retained no local counsel in Houston. The Centaurus plaintiffs were represented by skilled and experienced Houston counsel, with the advantage of local knowledge. Counsel for the Centaurus plaintiffs carefully selected the two or three Harris County District Courts (from among the seven lawsuits filed) in which they saw the best opportunity to nominate and obtain their preference for an umpire on the appraisal panel, after the party-appointed appraisers did not agree on an umpire. The Centaurus plaintiffs nominated Rick Martinez as umpire, he was confirmed by the two or three district judges to whom the Centaurus plaintiffs submitted his proposed appointment, and at that point Alterra conceded his use in the remaining lawsuits. As one might fear from the appointment of plaintiffs' candidate for umpire, the appraisal did not go well for Alterra.

13.   Mr. Martinez, as the umpire and decisive vote, issued summary awards in the Centaurus lawsuits that well exceeded the amount of property loss expected by Alterra (and by Southwest Risk) in Alterra's layer of coverage. It became apparent to Alterra from the umpire's awards that, between Centaurus plaintiffs and other claimants in the AMREAC tower of coverage, Alterra's $10 million second layer of coverage would be exhausted. Alterra then chose to make payments to the full extent of its coverage, leaving most claims not fully satisfied and now extending into the third layer of coverage. However, because the third layer of coverage included three policies that were either placed with Hurricane Ike exclusions or had inception dates following Hurricane Ike, there was no coverage for the property losses reaching into the $15 million third layer of coverage.

14.   Upon the exhaustion of Alterra's second layer of coverage, property owners with unsatisfied claims for loss from Hurricane Ike (in particular, the Centaurus plaintiffs, who were the most active and whose claims were the best-developed) were left with no one to look to but Southwest Risk to satisfy their now-uninsured losses. The Centaurus plaintiffs again added

Southwest Risk as a defendant, demanding payment of the unsatisfied part of their appraisal awards and adding claims for attorneys fees (via the DTPA or Insurance Code) and interest. George Pappas, counsel for Southwest Risk, informed Ironshore (writing to Howard Fishbein, its designated claims-handler at York Pro) via a November 9, 2012 letter that the apparent outstanding claims by the Centaurus entities for the uninsured part of their losses totaled $11,448,490.27.

15.   Southwest Risk next received and forwarded to Ironshore, a November 29, 2012 letter from Sean Bukowski, one of three lawyers for the Centaurus plaintiffs (along with Robert Green and Will Lundquist), identifying uninsured losses of at least $11 million for the Centaurus plaintiffs. The demand letter nevertheless offered to settle all claims against Southwest Risk for the full amount of professional liability insurance available to it—i.e, the $5 million in Ironshore's policy. Counsel for the Centaurus plaintiffs noted the alternative of a recovery more than double that on a contractual basis alone, plus exposure for higher damages if supported by favorable findings under the Texas Insurance Code or DTPA. Southwest Risk discussed those claims, and three additional potential claims, in a December 13, 2012 letter from George Pappas to Howard Fishbein at YorkPro, reiterating the request that Ironshore defend and indemnity Southwest Risk. Ironshore made no response to, but simply ignored, its insured's request to protect it against the obvious excess exposure (more than double its policy limit) by tendering the applicable MPL limit in response to the demand for settlement.

16.   Because Southwest Risk failed to place coverage in the third layer that was applicable to Hurricane Ike, and because Ironshore ultimately denied coverage for the resulting negligence liability (see below), Southwest Risk (through ClearView, its subsequent owner) paid to compromise its liability for its customers' uninsured property losses. Settlement with the Centaurus plaintiffs alone required $6.9 million. Other claims remain outstanding, so the uninsured total of liability of

6

Southwest Risk for the error or omission in failing to timely place property insurance coverage ahead of Hurricane Ike will increase. The risk of an error giving rise to such liability is inherent in the insurance brokerage business. It is why brokers take out professional liability coverage such as that obtained from Ironshore.

### SOUTHWEST RISK DID NOT MISREPRESENT ANY FACTS IN ITS
### APPLICATIONS FOR PROFESSIONAL LIABILITY COVERAGE FROM IRONSHORE

17.   Southwest Risk obtained a Miscellaneous Professional Liability ("MPL") Policy from Ironshore beginning December 27, 2010, extending to February 15, 2012 ("the first policy"). Following ClearView's acquisition of Southwest Risk, ClearView then renewed that E&O coverage with Ironshore for the period of February 15, 2012-2013 ("the second policy"), including Southwest Risk as an insured. When Southwest Risk sought E&O coverage from Ironshore in December 2010 (using a Darwin Insurance Company application), and when it submitted an Ironshore application on May 17, 2011, it had no reason to believe the cumulative Ike-caused property losses in the AMREAC tower would exceed the first $25 million layer of coverage in the AMREAC tower —much less the second $10 million layer provided by Max Specialty Insurance Company (later known as Alterra Excess & Surplus Insurance Company).

18. Only when adverse appraisal awards were rendered against Alterra, and it paid its limit in October 2012, did Southwest Risk and ClearView realize that the insurers' reserves or estimates of losses were well short of actual Ike-caused property losses in the AMREAC tower. Only then did Southwest Risk realize the Ike-caused property losses would reach into the third layer of coverage and therefore create failure-to-place liability for Southwest Risk. Although Ironshore denied coverage to Southwest Risk as if pending property loss claims indicated negligence liability for Southwest Risk, in fact it faced no liability to customers if (as it understood) their Ike-caused losses

7

were well within the first $25 million layer (or at most, the second $10 million layer) of coverage in the AMREAC tower. When Southwest Risk submitted the two applications used to obtain professional liability policies from Ironshore, it did not have reason to believe property losses would exhaust Lexington's $25 million primary layer of coverage in the AMREAC tower.

19. Claimants (property owners in the AMREAC tower) apparently had similar expectations, until they hit a jackpot with their nominations of a particular umpire for the appraisal panel, certain judges' appointment of him, and his ensuring awards. The invocation, process and outcome of Alterra invoking its appraisal clause all occurred after November 11, 2011, when Lexington gave notice that it had exhausted its primary limit by payment of claims. Both of Southwest Risk's applications for MPL insurance from Ironshore preceded that exhaustion of the primary limit and Alterra's invocation of appraisal. Thus, the applications were submitted when Southwest Risk (and later, ClearView) was unaware of any reason to expect property losses to exceed even the first layer, much less the second layer, in the AMREAC tower. Southwest Risk then had no reason to foresee negligence claims against it for allowing a gap in insurance coverage for Ike-caused property losses.

### SCOPE OF IRONSHORE'S MPL COVERAGE

20.   Ironshore issued the first MPL policy on December 27, 2010 as policy number 000889100, with a limit of $10 million and an expiration date of February 15, 2012. The policy's Retroactive Date was March 19, 2004, although an amended retroactive date of March 24, 2009 applied to the second $5 million of the policy limit..

21.   Ironshore renewed the policy for the period February 15, 2012 to February 15, 2013 issuing it as policy number 000889101 to ClearView Risk Holdings, LLC, with a Named Insured Endorsement including Southwest Risk, LP. The policy limit was again $2 million, with a retroactive date of march 19, 2004, amended to a retroactive date of March 24, 2009 for the second

$5 million of coverage.

22.  Each Ironshore MPL policy delivered its coverage on a form bearing the caption: "Miscellaneous Professional Liability Insurance Policy." ("MPL policy"). In each policy, Ironshore made the following promise as its Insuring Agreement:

> THIS POLICY
>
> The Insurer will pay on behalf of the Insured all Damages and Claim Expenses in excess of the Retention and up to the applicable Limit of Liability specified in Item 5. of the Declarations that any Insured, in the performance of Professional Services, becomes legally obligated to pay because of Claims first made during the Policy Period or any Extended Reporting Period and resulting from a Wrongful Act.
>
> The policy's declarations page lists the Retention as $200,000 for "MGA/Program Related Claims," and $100,000 for "all other claims."

23.  The Ironshore policies' scope of coverage depends greatly upon the meaning of "Wrongful Act," which the policies define as follows:

> A.      Wrongful Act means the following actual or alleged conduct by an insured, or by any person or organization for which a Insured is legally liable, and which results form the performance of Professional Services for others:
>
> 1.      a negligent act, error or omission;

Southwest Risk's failure to place the third layer of coverage in time to include Hurricane Ike, resulting in the absence of coverage for its customers for Ike-caused property losses that turned out to reach into that third layer of coverage, was "a negligent act, error or omission" within the "Wrongful Act" definition and thus within the Insuring Agreement.

24. The Professional Liability policies issued by Ironshore to Southwest Risk and Clearview are "claims made" policies—they apply only to "claims" first made during the policy. Each policy defines "Claim" to mean "any written demand received by the **Insured** for **Damages** or for non-monetary relief based on any actual or alleged **Wrongful Act**." All claims against Southwest Risk,

9

made the basis of this lawsuit, were received by it during the term of the second policy, which commenced February 15, 2012 and was extended by Ironshore to May 15, 2013 (beyond its initial stated expiration date of February 15, 2013).

### IRONSHORE'S RESERVATION OF RIGHTS AND DEFENSE

25.  Ironshore, through its contracted claims administrator Howard Fishbein at York Pro in New York, responded to Southwest Risk's notices of its addition as a defendant to pending lawsuits by acknowledging notice of the claims during the second policy period and accepting coverage, subject to a reservation of the right to rely upon certain policy defenses. Southwest Risk saw that none of the defenses asserted appeared applicable, and was satisfied that it had indemnity coverage.

26.  Ironshore reserved the right to deny or limit coverage based upon four policy provisions, none of which precluded, or that it claimed to preclude, a duty to defend Southwest Risk in the seven Centaurus lawsuits. First, Ironshore asserted an applicable $5 million limit of liability for claims that preceded a secondary retroactive date of March 24, 2009—a point undisputed by Southwest Risk. Second, Ironshore asserted an exclusion of coverage (Part IV.A.5.) for "unfair competition, restraint of trade, or any other violation of the anti-trust laws." No such violations were inherent in the DTPA or Insurance Code claims, much less the negligence claim at the heart of the lawsuits—so Southwest Risk could see that this provision, too, did not prevent indemnity.

27.  Third, Ironshore asserted an exclusion (Part IV.A.14.) for any "dishonest, fraudulent, criminal or malicious acts, error or omission or any intentional or knowing violation of any law, statute, ordinance, rule or regulation." It did not say on what basis it asserted this exclusion, so its policyholder could only draw the ususal inference that it referred to the DTPA and Insurance Code violations. This exclusion did not apply to most, if any, of the claims alleged Southwest Risk, did not preclude indemnity for negligent failure to timely place coverage, and by its terms did not apply

10

to the duty to defend prior to a judgment against the insured. If Ironshore now claims to have believed at the time (and to have disclosed by citing an exclusion for "fraudulent . . . acts") that Southwest Risk had misrepresented facts in an application for insurance, it came nowhere near saying that in its reservation letters. Ironshore, in reserving rights and agreeing to defend, failed to inform Southwest Risk that application misrepresentation was in issue as a defense to coverage.

28.   Fourth, Ironshore asserted that, under Part V. of the policy, it "has the right and duty to defend a covered **Claim** against an **Insured**" and "to select defense counsel to defend the **Insured**." It declared its intent "to facilitate your [Southwest Risk's] retention of Wilson Elser." That firm was counsel nominated by Ironshore, not the counsel desired by Southwest Risk. Ironshore did not initially acknowledge, but ultimately accepted, controlling Texas law giving an insured the right to select defense counsel at an insurer's expense when the insurer asserts a reservation or rights regarding a policy defense that overlaps the merits of the tort lawsuit. The reserved rights to deny coverage based upon exclusion 5 for "actual or alleged unfair competition, restraint or trade," and exclusion 14 for "actual or alleged fraudulent conduct," created conflicts of interest overlapping tort and coverage issues. Southwest Risk rather than Ironshore was thus entitled to select defense counsel as a matter of Texas law, notwithstanding Ironshore's stated right of selection.

### IRONSHORE BREACHED ITS OBLIGATION TO TIMELY RESPOND TO, AND SETTLE WITHIN COVERAGE, LAWSUITS FOR FAILURE TO PLACE COVERAGE

29. As indicated above, Ironshore defended under a reservation of the right to deny coverage for the *Centaurus* lawsuits based upon certain policy provisions, but then ignored offers by the *Centaurus* plaintiffs in 2012 to settle their lawsuits against Southwest Risk within the MPL policy limit. It also ignored Southwest Risk's request that Ironshore participate in settlement discussions.

30.   Southwest Risk, trying to stimulate some interest on its insurer's part to fulfill contract

obligations and protect a policyholder, sent an April 21, 2013 email (via John Garner, its chief financial officer) to Mike Mitrovic of Ironshore, requesting a telephone conference between them (to include Roger Sullivan, head of claims for Houston International Insurance Group, which by then had sold Southwest Risk to ClearView). Mr. Mitrovic's April 21 response indicated, for the first time, a major change in our insured's position that the Centaurus claims were pled into coverage and it would defend subject to a reservation of rights:

> We are represented by counsel. You should speak with him. The Ike claim which clearly proceeded the AWAC and Chubb matters is not covered and was known about at the time the insurance was procured by Southwest. There is nothing to talk about.

31.  Prior to that email, Southwest Risk had no idea that our insurer had retained coverage counsel and no longer intended to communicate directly with its policyholder about liabilities more than double its MPL limit, and an offer to settle for that limit. Neither did Southwest Risk know, prior to that April 21 email, that Ironshore believed the Centaurus claims arising from failure to place third-layer coverage applicable to Hurricane Ike were outside coverage because they were "known about at the time the insurance was procured by Southwest." It would have been useful to Southwest to have known that Ironshore considered that previously unstated basis for denying coverage to be so clearly established that it had "nothing to talk about" with its policyholder. Had Ironshore invested slight effort in communicating its "no coverage" position when Southwest Risk reiterated its request for indemnity in December 2012—when Southwest Risk could have settled outstanding claims for $5 million—Southwest Risk would have known it had to pay its own funds to minimize its liability and would have done so for a lower price than it later had to pay.

32.  Ironshore identified its coverage lawyer in an April 23 email from Michael Adler to John Garner. That attorney is David Sheiffer of Wilson Elser in New York—the same law firm Ironshore

had appointed to *defend* Southwest Risk when it was first added to the pending Centaurus lawsuits. It is perhaps unsurprising that neither Ironshore nor Wilson Elser previously chose to tell Southwest Risk that the lawyer whom Ironshore named to defend it had been repositioned as the lawyer working for Ironshore against Southwest Risk. Nevertheless, Southwest Risk (now acting through ClearView, which had purchased it) sent an April 25, 2013 letter to David Sheiffer, explaining that it viewed Mr. Mitrovic's April 21 email as a denial of coverage by Ironshore, and seeking clarification from Mr. Sheiffer on that point. John Garner also notified Mr. Sheiffer of a settlement conference with the Centaurus plaintiffs on May 2, 2013, and invited Ironshore's participation. Mr. Sheiffer replied on April 26, 2013 stating "we have just recently been retained on this and will advise further once our review is completed."

33.  Notwithstanding the delay from December 2012, as Ironshore ignored the policy limits settlement demand and then belatedly brought in coverage counsel to speak for it, there remained an opportunity to settle all claims of the Centaurus plaintiffs for our insured's $5 million policy limit into May 2013! Sean Bukowski, again speaking for all Centaurus plaintiffs, sent a May 6, 2013 letter to George Pappas updating those plaintiffs' damages to the sum of $12,281,785.99, yet still offering to settle all claims for the limit of Southwest Risk's professional liability coverage with Ironshore (i.e., $5 million). The letter set a deadline for acceptance of May 21, 2013. Southwest Risk forwarded the letter to David Sheiffer the next day.

34.  Meanwhile, Ironshore (through YorkPro, its claims administrator) continued to identify applicable coverage for Southwest Risk in response to notice of claims, subject to a reservation of rights based on exclusion 14,but with no contention that Southwest Risk had misrepresented facts in an insurance application or failed to disclose to Ironshore circumstances indicating a probable claim against Southwest Risk. (e.g., the May 13, 2013 reservation of rights letter from York Pro to

13

George Pappas regarding the claim of Houston Patricia Southway, LP).

35.  Ironshore finally declared its position through its lawyers at Wilson Elser on May 17, 2013. A letter of date from David Sheiffer to John Garner at ClearView acknowledged receipt of prior correspondence from Southwest Risk/ClearView (including its counsel), and the opportunity to settle for limit of its professional liability coverage with Ironshore, but declared that "Ironshore does not lend any credence to the allegations raised in the *Centaurus* matters." The letter instead went on to explain Mr. Sheiffer's view that Ironshore's coverage was unavailable to Southwest Risk. After first dismissing the credibility the Centaurus claims, the letter made no effort to indicate why or how the liability or damages claims being asserted by the Centaurus plaintiffs were wrong.

### IRONSHORE'S REASONS FOR DENYING COVERAGE ARE INCONSISTENT WITH BOTH THE FACTS AND ITS RESERVATION OF RIGHTS

36.  Mr. Sheiffer's May 17, 2013 denial letter asserts that Ironshore provides no coverage for Southwest Risk under either its first or its second policy because various lawsuits against Southwest Risk prior to the inception of Ironshore's first policy (what he calls the "pre-policy complaints) were "Related Wrongful Acts," which the MPL policies define as follows:

> Wrongful Acts that are the same, related or continuous, or Wrongful Acts that arise from a common nucleus of facts. Claims can alleged Related Wrongful Acts regardless of whether such Claims involve the same or different claimants, Insured or legal causes of action.

By characterizing pre-inception lawsuits entirely unrelated to the Centaurus lawsuits as "Related Wrongful Acts," Centaurus persuaded itself that it could invoke Section IV. B. 5 in its policies ("all Claims arising from the same Wrongful Act or Related Wrongful Acts will be considered to have been made on . . . the date the first of those Claims is made against an Insured") and thereby deny coverage for the Centaurus claims based upon the date of the first pre-policy complaint.

37.  Mr. Sheiffer's May 17, 2013 letter attempts to justify the Related Wrongful Acts

14

conclusion by equating the NAM tower of insurance coverage with the AMREAC tower of insurance coverage, and the eight pre-policy complaints listed in his letter with the entirely distinct Centaurus lawsuits. The attempt fails, as a matter of policy language, plain meaning and logic. First, the NAM tower of coverage and the AMREAC tower of coverage are entirely distinct, covering different properties and owners. Second, in every pleading served upon Southwest Risk in the lawsuits listed by Mr. Sheiffer as pre-policy complaints, the plaintiff asserted claims regarding the handling of *claims*—i.e., for coverage itself, mistaking Southwest Risk for a claims administrator. No pleading served upon Southwest Risk, among the lawsuits listed as pre-policy complaints, complains that Southwest Risk was liable for failing to timely place a layer of coverage, resulting in uninsured losses stemming from Hurricane Ike. Conversely, the Centaurus lawsuits were entirely and only about such failure to timely place coverage.

38.   As a result, what Ironshore calls the pre-policy complaints are not "logically or causally connected by common facts, circumstances, transactions, events and/or decisions" to the Centaurus lawsuits, do not share a "common nucleus of facts," and as a result are not "Related Wrongful Facts" that can be treated as one Wrongful Act in order to deem all of them asserted on the date the first was asserted. Ironshore made that leap across the chasm of dissimilarity in order to lump the Centaurus lawsuits with the *Glenbrook Patiohome Owners Association* lawsuit, Cause No. 2010-37578, filed in Harris County on June 18, 2010 against Southwest Risk and other defendants. The closest the *Glenbrook Patiohome* lawsuit and other pre-policy complaints come to having "common facts, circumstances, transactions, events and/or decisions" with the Centaurus lawsuits is that all involved property insurance and all arose from Hurricane Ike.

39.   Two of the pre-policy complaints involved properties in the AMREAC program, but in neither lawsuit did plaintiff serve Southwest Risk with a pleading alleging a gap in coverage.

15

Instead, in the *Glenbrook Patiohome* lawsuit, plaintiff mistook Southwest Risk for an entity involved in claims-handling—an allegation that was baseless and ultimately abandoned. The *Adams-LaSalle* lawsuit also involved an insured under the AMREAC program, but again Southwest Risk was never served with a pleading alleging any liability for a gap in coverage. Instead, Plaintiff's Original Petition did not even specify any basis for the supposed negligence of Southwest Risk, and simply lumped it with all defendants as having failed to fairly make claim payments, affirm or deny coverage, and fulfill other duties limited to insurers and claim-handlers (of which it was neither). The Adams-LaSalle allegations against Southwest Risk were likewise abandoned when plaintiff non-suited Southwest Risk soon after having sued it.

40. Ironshore also asserted, in Mr. Sheiffer's May 17, 2013 denial letter, that Southwest Risk made "material non-disclosures" in its application, which also violated Section VI.B.2. of the policies. To reach that conclusion, Ironshore simply assumed that because Southwest Risk knew it had not succeeded in placing the third layer of coverage in the AMREAC tower in time to cover Hurricane Ike, it had reason to expect claims arising from that failure. That assumption entirely ignores the $35 million of property coverage that existed to pay losses before the third layer of the AMREAC tower of coverage would ever be put at issue. When Southwest Risk filed its applications for MPL policies on November 1, 2010 and May 17, 2011, it believed the total of property claims would not exceed Lexington's $25 million primary policy. Even much later, when Alterra invoked the appraisal process in November, 2011, Southwest Risk understood that the total of property losses was well short of exhausting Alterra's second $10 million layer in the AMREAC tower.

41. Southwest Risk therefore had no reason to identify its failure to timely place the layer of coverage above $35 million as an error or omission that was likely or would be reasonable expected to result in an E&O claim against Southwest Risk. Further, as even Ironshore concedes by

quoting it in Mr. Sheiffer's denial letter, Section VI.B.2. of its policies declares coverage for claims occurring after the Retroactive Date (March 19, 2004) and before expiration of the policy unless the insured's "actual or constructive knowledge of the circumstance or incident(s) which led to the Claim and reason to believe it would result in a Claim" *preceded* "the Effective Date of the *first* Miscellaneous Professional Liability Policy issued by the Insurer to an "insured." (emphasis added). That date was December 27, 2010—when the prospect of claims exceeding Lexington's *first* layer of $25 million was unknown to Southwest Risk and Alterra, and probably even to Lexington.

42. Ironshore's reliance upon pre-policy complaints to support its claim of misrepresentation in applications is rendered all the more implausible upon considering that the questions it cites (Question 16 in the November 1, 2010 application; Question 35 in the May 17, 2011 application) pertain to potential future claims, not to existing claims. There was no need to disclose existing claims (i.e., the pre-policy complaints) because there obviously could be no coverage for them—they were claims plainly made prior to policy inception. That is why the applications did not ask about pending claims. Lawsuits naming Southwest Risk on a mistaken basis that it functioned as an insurer and was responsible for the handling of claims (primarily in the NAM program) were nowhere near suggesting that Southwest Risk faced potential liability in the AMREAC program arising from failure to place the third layer of coverage applicable to Hurricane Ike. The nature of the liabilities, the acts giving rise to liability, the legal theories and the insurance programs were entirely distinct between the pre-policy complaints and the Centaurus lawsuits. Ironshore knew this, yet chose to try to equate the Centaurus lawsuits with the unrelated prior complaints that mistook Southwest Risk for a claim handler. Ironshore did so in order to justify denying coverage and save $5 million that was otherwise immediately payable to compromise its insured's greater liabilities.

43. Upon review of Mr. Sheiffer's May 17, 2013 denial letter, Southwest Risk realized it

had to settle the Centaurus claims (and would have to settle other claims as appropriate opportunities arose) in order to avoid greater liability. Southwest Risk therefore consummated a settlement with the Centaurus plaintiffs for $6,900,000 on June 17, 2013. Not only was that settlement $1.9 million more than the amount for which those claims could have been settled had Ironshore either accepted coverage or made a timely denial, but Southwest Risk continues to face additional claims in the AMREAC tower for failure to timely place coverage, which will produce additional liability. Ironshore's liability for wrongful denial of coverage to Southwest Risk is a minimum of $6.9 million, plus attorneys fees, costs of court and pre-judgment interest.

44.  Ironshore waived, or is estopped to assert, its coverage defense of application misrepresentation because it never asserted that defense prior to David Sheiffer's May 17, 2013 letter explaining (for the first time) Ironshore's reasons for denial of coverage. Ironshore had agreed to defend Southwest Risk after it was added to the *Centaurus* lawsuits in May 2012, subject to its reservation of based upon stated policy provisions. Southwest Risk counted upon that reservation of rights as indicating the only grounds on which Ironshore might deny indemnification. Although the amount of Southwest Risk's Retention ($200,000) meant that Ironshore did not yet have to pay the legal bills of Southwest Risk's counsel, its duty to defend and acceptance of that duty meant that it was obligated to state coverage defenses at the inception, or waive or be estopped to assert them.

### EXTRA-CONTRACTUAL LIABILITY FOR UNFAIR CLAIM HANDLING

45.  Ironshore's failure to extend or even timely deny coverage, when a reasonable insurer in its position would have done so, fell far below the standards of ordinary and prudent claim handling. It subjected Southwest Risk to damages in excess of the coverage provided by Ironshore (even had that coverage been belated honored, the demand has risen to $6.9 million). Ironshore is therefore liable for unfair claim settlement practices under the Texas Insurance Code. Section

542.003(b) and 541.060(a) declare it an unfair claim settlement practice for an insurer to

> (4)     not attempt[] in good faith to effect a prompt, fair, and equitable settlement of a claim submitted in which liability has become reasonably clear.

Ironshore breached the Texas Insurance Code and is liable for all resulting damages.

46.   Tex. Ins. Code 541.151 authorizes a private cause of action for that practice:

> A person who sustains actual damages may bring an action against another person for those damages caused by the other person engaging in an act or practice:

> > (1)     defined by Subchapter B to be an unfair method of competition or an unfair or deceptive act or practice in the business of insurance

Tex. Ins. Code 541.152 provides for actual and multiple damages here.  A prevailing plaintiff:

> (a) . . . may obtain

> > (1)     the amount of actual damages, plus court costs and reasonable and necessary attorney's fees; [and] . . .

> (b)     On a finding by the trier of fact that the defendant knowingly committed the act complained of, the trier of fact may award an amount not to exceed three times the amount of actual damages.

Plaintiffs seek up to treble their actual damages because Ironshore had full knowledge of the facts indicating Southwest Risk was liable, and that Ironshore's policy provided coverage for that liability, yet it denied coverage anyway.

47.   Ironshore's assertion that Southwest Risk lacks coverage because it did not disclose its failure to place coverage applicable to Hurricane Ike is an attempt to re-write both Ironshore's policy and Southwest Risk's application for insurance. The application does not call for a listing of any error ever made, but only of errors the applicant has some reason to expect will result in professional liability claims. The policy does not exclude coverage for any prior error, but only for claims known to the insured before policy inception. Ironshore's invention of grounds for denial not found in the application or policy confirms that its wrongful denial of $5 million in liability coverage to

19

Southwest Risk, in the face of a *Stowers* demand for $6.9 million, was done "knowingly."

48.   Plaintiffs are also entitled to recover 18% *per annum* interest and reasonable attorney's fees, pursuant to Tex. Ins. Code 542.060, on the amount of their payment to settle claims. Pursuant to Tex. Ins. Code 541.058, interest should run on each settlement amount beginning 60 days after the dates of payments to the *Centaurus* plaintiffs and other claimants in the AMREAC tower of coverage, whose uninsured property losses from Hurricane Ike resulted in Southwest Risk's liability for failure to place an Ike-responsive third layer of coverage. Once plaintiffs paid $6.9 million to settle the Centaurus claims, and with respect to all other claims they have paid or will pay based upon liability for failure to place Ike-applicable coverage in the third layer of the AMREAC tower, they became or will be "claimants" within the meaning of Tex. Ins. Code 542.051. Once the tort plaintiffs were paid by Southwest Risk, their once-contingent liability claim matured into an actual loss to Southwest Risk, which became the claimant within the meaning of §542.051.

49.   Ironshore committed its violations of the Insurance Code knowingly within the meaning of Tex. Ins. Code 541.002. Ironshore's "actual awareness of the falsity, unfairness, or deceptiveness of" its stated grounds for denying coverage is apparent from

(a)   its bogus equation of unrelated claims and insurance programs, with dissimilar facts, circumstances and grounds for liability, in an effort to justify denying coverage;

(b)   its baseless assumption that Southwest Risk would have expected liability for failure to timely place a third layer of coverage, when neither Southwest Risk nor the second layer insurer believed property losses would exceed (if they would even reach) the second layer of coverage;

(c)   its acceptance of the defense of Southwest Risk under a reservation of rights that did not include its application misrepresentation defense, which it disclosed 10 months later—resulting in damages being paid by plaintiffs in excess of the $5 million for which the *Centaurus* lawsuits could have been settled had Ironshore given a timely response to its insured regarding coverage; and

(d)   its later retention, as coverage counsel, of the very lawyer it had appointed to defend

20

Southwest Risk.

Southwest Risk seeks an award of additional damages, up to three times of the amount of its actual damages, based upon Ironshore's knowing violation of the Texas Insurance Code in failing to "attempt[] in good faith to effect a prompt, fair, and equitable settlement of [claims against Southwest Risk] in which liability has become reasonably clear."

50.  Plaintiff also seeks recovery of its attorney's fees and costs of court in this lawsuit. Such recovery is sought pursuant to Tex. Civ. Prac. & Rem. Code 38.001 for Ironshore's breach of contract, or pursuant to Texas Insurance Code §541.152(a)(2) for Ironshore's violations of the Insurance Code.

51.  To summarize, the money sought from Ironshore for its violations consists of:

| | |
|---|---|
| Actual damages: | $6,900,000 |
| Interest at 18%: | to be determined |
| Trebled damages for Ins. Code violation: | $20,700,000 |
| **TOTAL DAMAGES:** | **$27,600,000** plus interest & attorney's fees |

### CONCLUSION AND PRAYER

Southwest Risk, L.P. and ClearView Risk Holdings, LLC therefore pray that Ironshore Specialty Insurance Company be summoned to appear and answer this lawsuit, that they have judgment against Ironshore for actual and additional damages, attorneys fees and interest, and for such further relief to which they may be entitled.

Respectfully submitted,

RAMEY, CHANDLER, QUINN & ZITO, P.C.

By:      /s/ *Jack McKinley*

Jack McKinley
State Bar No. 13716300

21

750 Bering Drive, Suite 600
Houston, Texas 77057
TEL:   (713) 266-0074
FAX:   (713) 266-1064
Email: jmm@ramey-chandler.com

ATTORNEYS FOR PLAINTIFF