United States District Court
Southern District of Texas
**ENTERED**
May 18, 2016
David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| SOUTHWEST RISK, L.P., *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-14-1745 |
| | § | |
| IRONSHORE SPECIALTY INSURANCE | § | |
| COMPANY, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

The plaintiffs, Southwest Risk, L.P. ("Southwest") and its owner, ClearView Risk Holdings, L.L.C. ("ClearView"), sued their insurer, Ironshore Specialty Insurance Co. ("Ironshore"). They sought a declaratory judgment that the professional-liability insurance policy they purchased from Ironshore covers their indemnification claim. They also sought damages under the Texas Insurance Code.

Ironshore moved for summary judgment that the insurance policy does not cover the claims against Southwest and ClearView for which they seek indemnification because: (1) the claims were not made during the policy period, (2) Southwest and ClearView failed to disclose the claims on their insurance application, (3) the fortuity doctrine barred the claims, and (4) Southwest's former owner, Houston International Insurance Group, funded the settlement of the claims, meaning that the plaintiffs did not suffer any losses. (Docket Entry No. 28). Southwest and ClearView cross-moved for summary judgment that the policy terms require Ironshore to indemnify them and that Houston International's payment did not affect Ironshore's liability. (Docket Entry No. 30). Southwest and ClearView argued in the alternative that factual disputes material to determining whether the policy terms bar coverage and whether the fortuity doctrine applies preclude summary

1

judgment.

Ironshore moved for leave to supplement its motion to assert a new argument supporting summary judgment. (Docket Entry No. 42). The court heard oral argument. (Docket Entry No. 44).

Based on the pleadings, the parties' written and oral arguments, the record, and the applicable law, the court grants Ironshore's motion for summary judgment and denies Southwest's and ClearView's cross-motion. The motion for leave to supplement is dismissed as moot. By **May 27, 2016**, the parties must file a proposed final judgment.

The reasons are explained below.

I.    **Background**

    A.    **Southwest Creates AMREAC, and Hurricane Ike Hits**

Southwest is an insurance broker specializing in securing property and casualty insurance for real-estate and construction projects. Southwest formed the American Real Estate Advisory Council L.L.P. ("AMREAC") to provide insurance for third-party property owners,[1] and through AMREAC insured various apartment complexes in Houston, Texas. Southwest represented to the potential insureds that AMREAC would cover the risks of physical loss up to $100 million by arranging a "tower" of coverage spread across independent policies. (*See, e.g.*, Ex. 19). Thirty-four different owners insured their properties with AMREAC, for a total insured value of $1.1 billion. (Docket Entry No. 28, Ex. 1A, Part 2 at p. 10).

Southwest timely placed two layers of insurance on the properties before Hurricane Ike emerged as a threat. The first layer was a policy providing up to $25 million in coverage. The second layer was a policy that provided an added $10 million. Southwest was to place additional

---

[1]  Neither AMREAC nor Southwest owned the properties. (Docket Entry No. 28, Ex. 1A, Part 1 at p. 11).

layers to reach $100 million in coverage.  Before Southwest did so, however, Hurricane Ike was moving toward Houston.  Insurers were unwilling to issue a policy in the face of the impending hurricane, so Southwest could not place any additional coverage for hurricane-related property damage.  The result: AMREAC-insured properties were not covered for Hurricane Ike claims exceeding $35 million, even though the owners were told, when they purchased the policies, that the coverage limit was $100 million.

Hurricane Ike lived up to the threat and caused considerable damage.  The AMREAC-insured property owners submitted claims under the two insurance policies Southwest had placed.  The property owners exhausted the policies but were not insured as Southwest had promised.  Significant damages went uninsured.

### B.      The *Adams LaSalle* Claims Begin

#### 1.      The Demand Letter

On September 10, 2010, after exhausting the primary and excess insurance policies that Southwest did place under the AMREAC program, Adams LaSalle Realty, among others, sent Southwest a demand letter.  The letter demanded coverage and payment of over $1.2 million in hurricane-related property damages.  The letter accused Southwest of "misrepresenting and/or failing to discuss with [the property owners] pertinent facts or policy provisions relating to coverage as an issue." (Docket Entry No. 28, Ex. 47 at p. 5).  There is no dispute that Southwest received the demand letter.

#### 2.      The Original Petition

That same day, the *Adams LaSalle* claimants sued Southwest and others in Texas state court alleging misrepresentation under the Texas Insurance Code.  (Docket Entry No. 28, Ex. 48).  The original petition alleged that the defendants, including Southwest, had "misrepresent[ed] one or

3

more material facts and/or policy provisions relating to coverage." (Docket Entry No. 28, Ex. 48 at p. 13). The plaintiffs served Southwest, which answered on October 8, 2010. (Docket Entry No. 28, Ex. 51).

### 3.    The Amended Petition

The *Adams LaSalle* plaintiffs filed a more specific amended petition on October 6, 2010. (Docket Entry No. 28, Ex. 49). The amended petition alleged that Southwest had "benefit[ed] from the monies tendered by plaintiffs in good faith for a product that now appears to be inadequate and wholly different from what . . . was promised." (*Id.* at ¶ 58). It also alleged that the *Adams LaSalle* plaintiffs had "only recently discovered that some or all of the excess carriers may not provide coverage for the Hurricane Ike damages or associated losses." (*Id.* at ¶ 59).

The plaintiffs never served the amended petition on Southwest. The record shows, however, that Southwest's attorneys became aware of the amended petition in other ways and emailed Southwest executives a copy on June 15, 2011. (Docket Entry No. 33, Ex. 1 at p. 3).[2]

### C.    Houston International Sells Southwest to ClearView

Southwest's owner, Houston International, sold Southwest to ClearView on December 27, 2010. The sales contract provided that Houston International would indemnify ClearView against future claims "arising out of or relating to . . . any inaccuracy of any representation or warranty of the Seller." (Docket Entry No. 28, Ex. 54 at p. 40).

### D.    Southwest and ClearView Renew the Ironshore Insurance Policy

Southwest and ClearView purchased a professional-liability insurance policy from Ironshore

---

[2] The email was sent by George Pappas, one of Southwest's attorneys in the AMREAC litigation. (Docket Entry No. 28, Ex. 1A, Part 2 at p. 14). Copied on the email were Southwest executives, including Paul DeRidder, one of its vice-presidents. (Docket Entry No. 28, Ex. 1A, Part 1 at p. 41). These facts are undisputed. (*See* Docket Entry No. 36 at p. 1).

with effective dates of December 27, 2010 to February 15, 2012.  The plaintiffs renewed the policy.

The renewed policy is at issue.  (Docket Entry No. 28, Ex. 69).  The policy covered "only claims

first made against the insured during the policy period," which was February 15, 2012 to February

15, 2013.  (*Id.* at p. 2, 6).

The policy's definitions section included the following: a "claim" was defined as "any

written demand received by the insured for damages or for non-monetary relief based on any actual

or alleged wrongful act"; a "wrongful act" was defined as "actual or alleged conduct by an insured

. . . which results from the performance of professional services for others," including "a negligent

act, error or omission"; and a "related wrongful act" was defined as "wrongful acts that are the same,

related, or continuous, or wrongful acts that arise from a common nucleus of facts."  (*Id.* at p. 6–7).

The policy made clear that "[c]laims can allege related wrongful acts regardless of whether such

claims involve the same or different claimants, insured[s] or legal causes of action."  (*Id.* at p. 7).

For "multiple claims," the policy specified that "[a]ll claims arising from the same wrongful act or

related wrongful acts will be considered to have been made on the earlier of the following times: (a)

the date the first of those claims is made against an insured; or (b) the date the insurer first receives

written notice from an insured of the wrongful act."  (*Id.* at p. 12–13).

### E.   The *Centaurus* Claims Begin

On May 4, 2012, Centaurus Unity, L.P. sued Southwest.  (Docket Entry No. 28, Ex. 76).

Centaurus alleged that it "was never informed of any coverage issues regarding gaps in coverage

on the property" and that Southwest was negligent in failing to inform Centaurus about the coverage

gap for Hurricane Ike claims.  (*Id.* at p. 13).

### F.   Houston International Funds the *Centaurus* Claims

ClearView sought indemnification against the *Centaurus* claims from Southwest's former

owner, Houston International, under the December 2010 sales contract between ClearView and Houston International.  (Docket Entry No. 28, Ex. 76).  On June 17, 2013, Southwest settled the *Centaurus* claims for $6.9 million.  (Docket Entry No. 63).  Houston International funded the entire settlement.  (Docket Entry No. 28, Ex. 1A, Part 2 at p. 7).  Ironshore moved under Federal Rule of Civil Procedure 17 to add Houston International as a real party in interest to this action.  The court denied that motion in a February 11, 2015 order.  (Docket Entry No. 18).

Southwest and ClearView now seek $6.9 million in coverage under the Ironshore policy for the *Centaurus* claims.  (Docket Entry No. 1).  They also seek $20.7 million in damages under the Texas Insurance Code.  (*Id.*).

## II.     The Legal Standard for Summary Judgment Under Rule 56

"Summary judgment is required when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015) (quoting FED. R. CIV. P. 56(a)).  "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).  "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'"  *Id.* (quoting *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the non-movant bears the burden of proof at trial, the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial."  *Id.*

6

(quotation marks omitted); *see also Celotex*, 477 U.S. at 325.  Although the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted).  "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

"Once the moving party [meets its initial burden], the non-moving party must 'go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'" *Nola Spice*, 783 F.3d at 536 (quoting *EEOC*, 773 F.3d at 694).  The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007).  "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075).  In deciding a summary-judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008); *see also Nola Spice*, 783 F.3d at 536.

When the parties cross-move for summary judgment, the court must review "each motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Mid-Continent Cas. Co. v. Bay Rock Operating Co.*, 614 F.3d 105, 110 (5th Cir. 2010)

(alteration omitted) (quotation marks omitted).

### III.   Whether the *Centaurus* Claims Were Made During the Policy Period

The policy period ran from February 2012 to February 2013.  Any claim made against Southwest before February 2012 is not covered.  Ironshore argues that the *Centaurus* claims were "made" in September 2010, when the *Adams LaSalle* plaintiffs became the first AMREAC policyholders to sue Southwest.  Under the policy, "multiple claims" involving "related wrongful acts" arise on the date the first of those claims was made against the insured.  The policy defines "related wrongful act" to include wrongful acts "that arise from a common nucleus of facts" even if "such claims involve the same or different claimants, insured[s] or legal causes of action."

Ironshore argues, and the plaintiffs do not appear to dispute, that Southwest received multiple claims based on its failure to place the coverage it promised under the AMREAC program.  The *Adams LaSalle* and *Centaurus* actions clearly arose from "related wrongful acts" implicating the common factual nucleus, Southwest's misrepresentation of the AMREAC program coverage.  As a result, Ironshore reasons, the *Centaurus* claims relate back to September 2010, when Adams LaSalle sent its demand letter and sued Southwest on grounds that included misrepresentation.  This is clearly outside the policy period and therefore not covered.

Southwest responds that it never received a "claim" from the *Adams LaSalle* action.  The policy defines a "claim" as "any written demand received by the insured for damages or for non-monetary relief based on any actual or alleged wrongful act."  (Docket Entry No. 28, Ex. 69 at p. 7).  The question is how to interpret that term.

### A.   Interpreting an Insurance Policy Under Texas Law

Under Texas law, "[t]he policy's terms are given their ordinary and generally-accepted meaning unless the policy shows the words were meant in a technical or different sense," and courts

must first "look at the language of the policy [presuming that the] parties intend what the words of their contract say." *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010). "Only if an insurance policy remains ambiguous despite these canons of interpretation should courts construe its language against the insurer in a manner that favors coverage." *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995). "Not every difference in the interpretation of a contract or an insurance policy amounts to an ambiguity. Both the insured and the insurer are likely to take conflicting views of coverage, but neither conflicting expectations nor disputation is sufficient to *create* an ambiguity." *Id.* (alteration omitted) (quotation marks omitted).

### B. Whether the September 2010 *Adams LaSalle* Demand Letter and Original Petition Were "Claims"

The *Adams LaSalle* plaintiffs filed their original petition on September 10, 2010 and sent Southwest a demand letter that same day. Southwest agrees that it received Adams LaSalle's demand letter and original petition on September 10, 2010, that it was served, and that Southwest answered on October 10, 2010. Southwest nonetheless contends that the original petition and demand letter were not "claims" because they did not clearly allege broker liability but instead focused on claims that the primary insurers had wrongfully adjusted or refused to pay for Hurricane Ike claims. Southwest asserts that a review of the original petition led it to believe that it had been "misjoined." Both the original petition and the demand letter alleged that all of the defendants, including Southwest, had misrepresented the insurance policy's coverage. (Docket Entry No. 28, Ex. 47 at p. 5; Docket Entry No. 28, Ex. 48 at p. 13). Southwest responds that this "single, generic allegation" was not enough for notice that it was subject to a "claim." Instead, according to Southwest, the original petition was a "shotgun pleading directed aimlessly against every entity that had anything to do with the insurance program." (Docket Entry No. 30 at p. 15).

9

Neither the policy language nor the record supports this argument.  The policy states that a "claim" is made when the insured receives a written damages demand.  Southwest received a demand letter and was sued on September 10, 2010.  Both the letter and the petition sought damages from Southwest and others for misrepresenting insurance coverage to AMREAC program participants.  The allegations were sufficiently clear, written claims for damages against Southwest.  Southwest's Rule 30(b)(6) representative also testified that "Southwest knew when it got [the demand letter] . . . that it had engaged in conduct that had resulted in claims of misrepresentation by one of the AMREAC program participants" and that "it might get sued over this."  (Docket Entry No. 28, Ex. 1A, Part 1 at p. 42–43).  Southwest was sued the same day.

Southwest received a written claim for damages in the *Adams LaSalle* litigation on September 10, 2010.  The *Adams LaSalle* litigation and the *Centaurus* litigation are multiple claims against Southwest stemming from related wrongful acts.   Under the Ironshore policy terms, "multiple claims" involving "related wrongful acts" arise when the first claim against the insured was made.  That first claim was made on September 10, 2010.  The policy period began in February 2012.  There is no factual dispute material to determining that the *Centaurus* claims fall outside the policy period.

**C.      Whether the June 2011 Email with the Amended Petition Was a "Claim"**

Even if the demand letter and original petition were not "claims," Southwest concedes that the first amended petition "would arguably have put it on notice of the wrongful act at issue." (Docket Entry No. 30 at p. 15).  Southwest argues that because it was never effectively served with the amended petition, the petition was not "received" and cannot count as a "claim."

Southwest has not argued that, or explained how, the word "received" is ambiguous.  Absent ambiguity, the court gives the term its ordinary meaning.  The policy language provides no basis to

10

conclude that the only way for an insured to "receive" a written demand for damages is through formal service of process.  Southwest cites no dictionary definition, policy provision, or case law in support of this argument.  The policy does not define a "claim" to mean "any written demand *served on the insured* for damages."  It says "received by the insured."  To hold otherwise would "remake the[] contract by reading additional provisions into it" rather than "honor the parties' agreement," as the case law requires.  *Gilbert*, 327 S.W.3d at 126.

The record shows that Southwest "received" the amended petition when one of its attorneys emailed it to Southwest executives on June 15, 2011.  If this is the date Southwest received the *Adams LaSalle* claims, the *Centaurus* claims are still not covered, because the policy period started approximately eight months later.

Southwest's receipt of the amended petition is an independent ground for finding no factual dispute material to determining that the claims fall outside the policy period.

## IV.   Whether the *Centaurus* Claims Were Resolved When Houston International Funded Their Settlement

Even if the claims are within the policy period, Ironshore argues alternatively that because Houston International funded the settlement of those claims by paying $6.9 million under its contract to indemnify ClearView, Southwest has been made whole and sustained no damages.

Ironshore cites Texas case law stating that "[a]n insured's right of indemnity under an insurance policy is limited to the actual amount of loss" and stressing the need to "eliminat[e] the potential for double recovery by the insured."  *Mid-Continent Ins. Co. v. Liberty Mut. Ins. Co.*, 236 S.W.3d 765, 775 (Tex. 2007).  The central case is *Paramount Fire Insurance Co. v. Aetna Casualty & Surety Co.*, 353 S.W.2d 841 (Tex. 1962).  In *Paramount*, the sellers and buyers of a house entered into a sales contract.  *Id.* at 842.  Before closing, both the sellers and the buyers bought fire insurance on the property.  The sellers were insured by Paramount Insurance; the buyers, by Aetna.

11

*Id.* at 842–43.  A fire destroyed the home.  The buyers still paid the sellers the full contract price.
*Id.* at 843.  The sellers assigned their rights under the Paramount policy to the buyers.  *Id.*  Aetna and
Paramount settled with the insureds and later sued each other to allocate liability for the loss.  *Id.*

     The Texas Supreme Court held that Paramount was not liable under its policy to the sellers.
The court relied on the "generally accepted principle" that an "insured is entitled to receive the sum
necessary to indemnify him, or to be put, as far as practicable, in the same condition pecuniarily in
which he would have been had there been no fire."  *Id.* at 844 (quotation marks omitted).  An
insured "may recover to the extent of his loss occasioned by the fire, but no more, and he cannot
recover if he sustained no loss."  *Id.* (quotation marks omitted).  The Texas Supreme Court
acknowledged Paramount's liability to the sellers when the fire occurred, but adopted the reasoning
of other state courts that "look[] to the substance of the whole transaction rather than to seek a
metaphysical hypothesis upon which to justify a loss that is no loss."  *Id.* (quoting *Ramsdell v. Ins.
Co. of N. Am.*, 221 N.W. 654 (Wis. 1928)).  The court distinguished the case from one "where a
stranger to the transaction, out of charity, or for other reasons, might make good the loss."  *Id.*
(quotation marks omitted).  Rather, the buyers paid the sellers the full amount in "a related
transaction."  *Id.* (quotation marks omitted).

     Southwest and ClearView argue that *Paramount* is different because it involved a dispute
between "two co-primary insurers who were jointly defending a mutual insured."  Here, by contrast,
"Houston International did not indemnify ClearView for the liability of Southwest in the capacity
of an insurer, but as the seller of Southwest."  (Docket Entry No. 30 at p. 41).  But at least one other
federal district court has read *Paramount* to mean that "recovery under insurance contracts [must
be limited] when insureds ultimately suffer[ ] no pecuniary loss," and that courts must "focus on the
transaction as a whole" in "a case by case analysis of the existence of a loss."  *Chambless v.*

*Travelers Lloyds of Tex. Ins. Co.*, 123 F. Supp. 2d 1028, 1032 (N.D. Tex. 2000) (alteration in original) (quotation marks omitted).  Southwest and ClearView have not shown a basis to conclude that *Paramount* cannot apply to a payment to the insured under an indemnification provision in a sales contract, rather than in an insurance policy.  Under *Paramount*, the critical question is whether the pecuniary loss the insured suffered was compensated by a "related transaction."  *See, e.g.*, *Leggio v. Millers Nat'l Ins. Co.*, 398 S.W.2d 607, 609–10 (Tex. App.—Tyler 1965, writ ref'd n.r.e.) ("Upon the question of whether or not an insured has sustained a pecuniary loss, the Supreme Court of this state in [*Paramount*] has adopted the rule that there is no pecuniary loss when the loss has been made good out of a related transaction . . . .").

The case law illustrates this point.  In *Leggio*, for example, a landlord sought insurance coverage when a fire destroyed one of his buildings.  The insurance company denied coverage because the tenant planned to tear the building down under an option in the tenant's lease.  The insurance company argued that the landlord had not suffered a loss because even though a fire destroyed the building, that building would have been destroyed when the tenant exercised the lease option.  The court rejected this argument because the insurance company failed to "conclusively establish" that the lease option was a "related transaction."  *Id.* at 612.  Instead, trial testimony showed "that while both parties to the lease contemplated that the option would be exercised and had actually made some preparation for the demolition of the building prior to the fire, . . . they had not gone far enough to reach a definite agreement."  *Id.* at 610–11.

By contrast, in *Hochheim Prairie Farm Mutual Insurance Ass'n v. Campion*, 581 S.W.2d 254 (Tex. App.—Corpus Christi 1979, writ ref'd n.r.e.), the court held that an insurer should have been allowed to introduce at trial evidence that its insured's builder had repaired hail damage to two roofs under a warranty agreement.  The evidence would show, the insurer argued, that the actual

13

pecuniary loss the insured suffered had been mitigated by a "related transaction" under the *Paramount* test. *Id.* at 257. The court agreed. Because the warranty agreement was a related transaction, the insurer "should have been allowed to introduce testimony to show that the [insured] had incurred no pecuniary loss to the roof as a result of the hailstorm." *Id.*

*Leggio* and *Hochheim* further undercut the plaintiffs' argument here that *Paramount* applies only in cases involving coinsurers. In *Leggio*, the question was not whether the payment was made by an insurer, but whether the payment was made in a related transaction. In *Hochheim*, the builder compensated the property owner under a warranty agreement, not an insurance policy, and that was a related transaction.

In this case, Houston International sold Southwest to ClearView under a contract stating that Houston International would indemnify ClearView against any claims arising from inaccuracies Houston International had made about Southwest. (Docket Entry No. 28, Ex. 54 at p. 40). That same day, Southwest and ClearView purchased a professional-liability insurance policy with Ironshore, covering negligence claims against them. (Docket Entry No. 28, Ex. 68). Both the indemnity contract and the insurance policy protected ClearView and Southwest from claims arising out the AMREAC program. Unlike the lease option in *Leggio*, the indemnity contract here was "conclusively established" in writing; Houston International performed on that contract to pay for the settlement of the *Centaurus* claims shortly after they were made. The payment was made in a contractual indemnity transaction related to both Southwest's and ClearView's underlying loss and the underlying insurance policy. Houston International was not a "stranger" to the transactions and did not pay to settle the *Centaurus* claims "out of charity." *Paramount*, 353 S.W.2d at 844.

The plaintiffs argue that the court's denial of Ironshore's motion to add Houston International as a party under Rule 17 necessarily means that Houston International's settlement

14

does not affect Ironshore's liability.  When the court ruled on the Rule 17 motion, the court and the parties believed that Houston International had only "paid part of the amount Southwest paid to settle the underlying lawsuit."  (Docket Entry No. 18 at p. 5).  It is now undisputed that Houston International paid the full amount.  (Docket Entry No. 28, Ex. 1A, Part 2 at p. 7).  The legal standards governing the Rule 17 analysis are different from the legal standards governing Texas insurance law.  Houston International is not a party to this action, nor is Houston International a named insured under the policy at issue.  Even if, unlike the plaintiffs, Houston International suffered a pecuniary loss, the court need not—and does not—decide whether Houston International could sue under an assignment of the claim from Southwest.

Taking account of the transaction as a whole, *see Paramount*, 353 S.W.2d at 844, and the need to prevent "the potential for double recovery by the insured," *Mid-Continent*, 236 S.W.3d at 775, Southwest and ClearView have not suffered a pecuniary loss because the full loss was compensated in a related transaction.  The lack of loss is an independent ground supporting summary judgment for Ironshore.[3]

## V.    The Claims Under the Texas Insurance Code

In addition to bringing claims under the policy, Southwest and ClearView also asserted extracontractual statutory claims for Texas Insurance Code violations.  (Docket Entry No. 1).  Because there is no coverage, the extracontractual claims fail as a matter of law.  *State Farm Lloyds v. Page*, 315 S.W.3d 525, 532 (Tex. 2010) ("When the issue of coverage is resolved in the insurer's favor, extra-contractual claims do not survive.").

## VI.    Conclusion

---

[3] The court does not reach Ironshore's two other grounds for summary judgment: that Southwest and ClearView failed to disclose the claims on their insurance application and that the fortuity doctrine bars the claims.

Ironshore's motion for summary judgment is granted.  (Docket Entry No. 28).  Southwest's and ClearView's cross-motion for summary judgment is denied.  (Docket Entry No. 30).  The motion for leave to supplement is dismissed as moot.  (Docket Entry No. 42).  By **May 27, 2016**, the parties must file a proposed final judgment.

SIGNED on May 18, 2016, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

16